Hon. J. S. Bosworth, Referee.
The evidence justifies the conclusion that it was understood between Greenleaf, Norris & Co. and their customers, for whom and on whose order the firm bought stocks on the security of a margin, that the firm might, according to the usual course of such business, pledge or hypothecate, as security for loans to the firm, the stocks thus bought.
*182 This being so, the mere pledge of such stocks would , not be of itself a conversion for which a right of action j would accrue to the customer. The obligation of the firm in such a case, would be, to keep on hand sufficient like stocks, and to deliver to the customer like stocks, and the quantity bought, on payment, by the customer to the firm, of the amount owing to the firm on account of such purchase.
But, stocks thus bought would, as between the customer and the firm, be the property of the customer for whom they had been bought. As between them, this relation of ownership and of pledgor and pledgee would continue, until there should be an actual-sale of the stocks, by the firm, directly or indirectly, through the pledgee of the stocks to whom they' had been pledged by the firm, or until such relation had been changed by other acts of the parties.
On such a state of facts, why should not a customer for whose account stock had been bought, and who could identify it as the stock bought on his order, and trace it from the firm to the pledgee, have the right, on the insolvency of the firm, to compel the pledgee to deliver it to him, on payment of the amount due to the pledgee, and to charge the firm with the sum paid to redeem the stock, and credit it with the sum owing to the firm on account of the stock, and thus be converted into a debtor or creditor of the firm for the balance resulting % If the customer paid less than he owed, he must pay the balance to the firm to perfect his right to retain the stock. If he paid more than he owed, why should he not be deemed a general creditor for the difference ?
The firm, prior to the appointment of the receiver (on March 2, 1878), had not required the customer to pay the amount he owed ; nor had the customer offered to pay what he owed and demanded his stock. The receiver, therefore, took possession, on March 2, 1878, of *183 such assets of the firm as it actually held, with such relations then existing between the firm and its customers for whom stock had been bought by the firm, and which the firm had not sold, but had hypothecated, as the facts proved in respect thereto establish.
The claim of R. H. Baker gives rise to many questions applicable to other claims. On January 26,1878, the firm bought for Baker, 500 shares of N. W. Preferred, and were paid by Baker $5,000 as a margin for buying and carrying the stock. The firm, prior to March 2, 1878, had bought in like way, for various customers, and including Baker, in the aggregate, 5,575 shares of this stock. Before the firm failed, it had hypothecated to persons of whom it had borrowed money, 5,475 shares of this kind of stock, and had lent, also, or otherwise disposed of, 100 shares, and, when it failed, it had no stock of this kind on hand. All that the firm had or should have had, was thus held by such pledgees of the stock, except the 100 shares which the firm had lent, or otherwise disposed of; and where that 100 shares had gone, between the loan, or other disposition of it, and the failure of the firm, does not appear.
If the contract between the firm and Baker was, that the firm should purchase and continue to hold 500 shares of this stock, ready to be delivered on payment of the purchase price, interest and charges, it was out of the power of the firm to comply with their contract, after they had parted with all the stock of this description, and their contract with Baker was then broken.
The firm having hypothecated the stock, and become insolvent, it, thenceforth, was lost to Baker, by the act of the firm (Lawrence v. Maxwell, 53 N. Y. 23).
The pledge, and sale by the pledgee, cannot be regarded as parts of a single transaction, constituting, *184 together, a sale by the firm, on the day the pledgee sold. There has, therefore, been no sale of Baker’s stock by the firm, which he can elect to ratify and hold the firm to be a debtor for the price it brought. And the claim presented is not based on an allegation of any specified sale of any designated 500 shares, and that the stock was Baker’s, and upon an election to ratify such sale.
I do not perceive on what ground it can be claimed that it is the duty of a receiver of an insolvent firm to redeem the stock which the firm had pledged, by paying the debts secured by such pledge, even if he had, as such debts matured, funds in hand equal to that end. I do not see that he would have any right to do this at the risk of loss to the general creditors, and for the benefit of the customers whose stock had been pledged by the firm. The tender made to the receiver by Baker did not impose any special duty upon the receiver. He did not have the possession or the control of the stock. The appointment of a receiver did not absolve the defendant, the surviving partner, from his liability on the firm contract with Baker. But a demand of the stock of him, accompanied with an offer to pay the amount due, would have been an idle ceremony. He was destitute of means, and the court had divested him of title to the firm’s assets by appointing a receiver of them. Notice of this appointment and of the order and judgment under which the pending proceedings were had, was published as early as March 9, 1878, and notice by mail was sent early to each creditor residing out of the city of New York (vide Report of April 9, 1878).
A tender to Warren E. Greenleaf, after March 2, 1878, of the amount due the firm, if made, would have been a tender of money which he could not have received. Anything of right payable to the firm, by *185 reason of transactions with it prior to the appointment of a receiver, could be paid to the receiver only.
Where the firm has so mixed the stock it has i bought for its customers, in hypothecating it with several pledgees on separate loans by each, that no customer can identify any of the stock in the hands of any pledgee as the stock bought on his order, he can not say it is his stock. And if, notwithstanding such hypothecation, the firm had continued to hold stock enough to deliver to each customer all to which he might be entitled on paying the amount due from him to the firm, the absurdity of claiming any right to the stock hypothecated would be so apparent that it would not be made.
The fact that the firm did not hold any stock which they could deliver, does not make stock which is not shown to have been bought for any customer, his property. Such a state of facts shows a conversion of I the stock, and leaves the customer at liberty to make a claim on that ground. The fact that the firm had no stock which they could deliver, and were insolvent,' might possibly leave the customer at liberty to claim the market value of the stock at the time these two facts concurred, by way of credit on account, without making a demand of the stock, and tendering payment of the amount due. A demand in such a case would be an idle ceremony, when the defendant was absolutely incapable to perform. A tender would be useless, as there was no one to whom a tender could be made, who would be bound to perform and could perform.
The death of two of the firm, and the appointment j of a receiver, has disclosed, or caused results which' show, that the firm, on March 2, was insolvent. Whether any such result would have been inevitable if the members of the firm who had died had continued *186 in good health, is not, perhaps, certain beyond a reasonable doubt. But it is established now, as results have been developed, that the firm was then insolvent. But crediting the customers of the firm with the value, on that day, of the kind of stock which the firm had previously bought on their order, but had been so used that it could not be traced and indentified, would give them all which full performance on that day would have brought to any customer. That is all the damage such a customer could have recovered, if he had tendered payment on the preceding day, and demanded his stock. Placing him in the position he would occupy if he had done that on the first day of March, which it was then practicable to do, but which could not be done subsequently, will secure to him all the relief which it seems feasible to extend to him in this action. As to stock bought for customers as N. W. Preferred was bought, and which had been so used by the firm that it cannot be traced, I think the customers must be limited, by way of a credit therefor, to its market value on March 2, 1878.
As to stock bought for a customer, and which can be identified in the hands of any pledgee of the firm, who has sold it, such customer may, as I am at present advised, elect to ratify such sale, if he has done nothing inconsistent with his right to make such election, and claim the price at which it was sold. If the proceeds of stock thus identified have come to the receiver’s hands, the customer may follow them. If the stock has come to the receiver’s hands, unincumbered by the pledge, and he still has it, the customer may reach it, and have a delivery of it, by paying to the receiver the amount owing to the firm in respect of it.
I think it a just conclusion, that it was a part of the contract between the firm and its customers that each *187 customer should have credit in account for whatever dividends might be declared upon the stock charged to such customer during the time the firm was carrying such stock. And it appears from the proofs that before March 2, 1878, dividends were declared upon Illinois Central stock, and upon Chicago and Alton stock, of which dividends the firm received the actual benefit, either by collecting the dividends, or by receiving credit therefor in its accounts with parties to whom it had pledged or loaned like stock. In cases where customers have not already been credited with such dividends, they should, on the adjustment of their accounts before me, be credited therewith, so that the amount of such credits will enter into the sum on which the dividend to creditors, out of the funds in the hands of the receiver, is to be paid.
These views accord substantially with the positions assumed by the receiver.